IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DISTRICT

---

**FRANCIS CAMILLO, M.D.,**

    **Plaintiff,**

v.                                                                                                   NO. _____

**CAMPBELL CLINIC, P.C., and**                         **JURY DEMANDED**
**CATHERINE OLINGER,**

    **Defendants.**

---

# COMPLAINT

---

**PLAINTIFF, FRANCIS CAMILLO, M.D.,** files this Complaint and shows:

## I.    PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Francis Camillo, M.D., is a citizen and resident of Memphis, Tennessee.

2. Defendant Campbell Clinic, P.C., is a Tennessee professional corporation that may be served with process through its registered agent: Frederick Azar, MD, 1400 S. Germantown Road, Germantown, TN 38138.

3. Defendant Catherine Olinger, M.D., resides in Memphis, Tennessee, but is a citizen of Colorado or Nebraska.

4. Jurisdiction is proper under 28 U.S.C. § 1331, and the Americans with Disabilities Act, with Amendments Act (ADA-AA). On or about September 14, 2018, Dr. Camillo timely filed a charge of discrimination with EEOC under the ADA-AA. EEOC mailed him a Notice of Right

to Sue on September 30, 2019. Accordingly, this matter is brought within the requisite ninety (90) days thereafter.

5. Additionally, supplemental jurisdiction exists over any state-law claims pursuant to 28 U.S.C. § 1367 given that the state-law claims are so related to the federal claims that they form part of the same case or controversy.

6. Venue is proper in this division of the Western District pursuant to 28 U.S.C. §1391 because Campbell Clinic, P.C. employed, and then terminated the employment, of Dr. Camillo in Memphis. Campbell Clinic, P.C. also has a principal place of business in Memphis, Tennessee. Additionally, Dr. Olinger worked in Memphis and made the false allegations against Dr. Camillo in Memphis.

## II.   FACTS

### A.   CAMPBELL CLINIC

7. Dr. Francis Camillo is a Board Certified orthopedic (spine) surgeon who, from 2004 to 2018, was employed by the Campbell Clinic in Memphis.

8. Campbell Clinic vests its practice, affairs and management in a Board of Directors. The Board of Directors has powers that include, but are not limited to, the right to hire and fire all employees; determine compensation of all employees (professional and otherwise); set the condition of all employees (professional and otherwise); determine the patients; determine the professional policies and procedure for patient care; and establish the fees for charging to patients.

9. Dr. Camillo was never on the Board of Directors. He functioned under a Chief of Staff who made assignments and resolved matters involving physicians.

10. All patients provided care by Dr. Camillo were considered the patients of Campbell Clinic and all income received by Dr. Camillo in the practice of medicine was considered earned by Campbell Clinic.

11. Campbell Clinic paid Dr. Camillo a regular annual salary plus additional compensation. Campbell Clinic provided the facilities, equipment, and supplies for Dr. Camillo's performance of his professional duties, including but not limited to receptionists, nurses, laboratory technicians, and other paraprofessional help.

12. Dr. Camillo was entitled, by contract, to take approved Leaves of Absence without loss of pay and, in the event of illness, his salary continuation.

### B. DISABILITY AND REASONABLE ACCOMMODATION

13. In 2017, Dr. Camillo was diagnosed with non-Hodgkins lymphoma and began a course of treatment known as "R-Chop Chemotherapy."

14. Due to the cancer, and its effect, Dr. Camillo has a "disability," as the term of art is defined under the ADA-AA, because the cancer impairment substantially limited him in the major life activity of cell growth while causing him substantial limitations in daily function and work due to pain, fatigue, mood regulation, and nausea.

15. Due to the disability, Dr. Camillo requested a reasonable accommodation of leave along with a flexible work schedule. This would allow him to undergo the periodic chemotherapy and the effects of the R-Chop. Dr. Camillo would not see patients the weeks that he underwent chemotherapy.

16. Campbell Clinic agreed to this accommodation. During the accommodation, while undergoing R-chop, and its mood-related effects, Dr. Camillo worked the flexible schedule. He

received his regular benefits and salary from Campbell Clinic. This meant, of course, that other physicians were contributing to the cost of his pay and benefits during the period that Dr. Camillo, due to his disability, could not fully contribute to theirs.

17. Dr. Camillo's chemotherapy generally consisted of six chemotherapy treatments every three weeks. His last chemotherapy session occurred in January of 2018 and he returned to work full time in March of 2018.

### C. DEFAMATION AND TERMINATION

18. Shortly after his full-time return, on or about March 30, 2018, Dr. Camillo worked as on-call surgeon at Regional One. Dr. Camillo directed a female resident, Defendant, Dr. Catherine Olinger, to place a patient with a neck injury in a "halo" to minimize the patient's movement. Dr. Olinger, a third-year resident, stated that she believed a halo was not medically necessary. Dr. Camillo, a Board Certified Orthopedic surgeon with 17 years of experience with expertise in the field of spine trauma surgery, explained why the halo *was* medically necessary and the potential consequence to the patient. When Dr. Olinger continued to argue, Dr. Camillo instructed her to do exactly as he had ordered, told her that he was done talking to her about it, and, for her insubordination, he would be calling her chief resident to ensure instructions were followed.

19. Dr. Camillo ensured the patient was placed in the halo. The patient had a successful outcome.

20. As he had said, Dr. Camillo also reported Dr. Olinger.

21. Having returned to work full time, Dr. Camillo learned there existed some resentment within Campbell Clinic about Dr. Camillo receiving his full salary and benefits during

his disability-related accommodation. He was told he had been "stealing from us," that he had not "carried his weight," that he did not "earn his keep," and that he had not "made money for the group."

22. On April 30, 2018, Dr. Olinger falsely wrote that Dr. Camillo had – an entire month earlier – used a sexist slur when reprimanding her about the halo. The resident published this slur to Campbell Clinic's for circulation. Upon information and belief, Dr. Olinger repeated the false allegation in a separate email to other members of Campbell Clinic. (See Ex. A hereto).

23. Dr. Camillo's allegations that Plaintiff used this slur are absolutely false.

24. Dr. Camillo did not use any slurs during his phone conversation with Dr. Olinger on March 30, 2018, and believes Defendant Olinger was attempting to deflect from her insubordination that could have endangered a patient's care.

25. Defendant, Campbell Clinic PC, re-published Defendant Olinger's defamatory statement in her email to the entire board and shareholders of Defendant Campbell Clinic, PC.

26. Defendant Campbell Clinic, PC received no independent corroboration of the veracity of Defendant Olinger's defamatory statement, while it did receive Plaintiff's complete and absolute denial that it had occurred.

27. Using the April 30, 2018 email, Campbell Clinic told Dr. Camillo it would be addressing what it called his "temper control." Dr. Camillo vehemently denied the resident's slur.

28. Regardless, for "temper control" issues, it is a well-documented and established practice at Campbell Clinic—some physicians multiple times—that *anger management* is offered.

Accordingly, Dr. Camillo invoked this practice by requesting it, recognizing that R-Chop did affect his moods.[1]

29. In June of 2018, Campbell Clinic refused a further accommodation of anger management to Dr. Camillo. It terminated his employment, using the "temper" theme and the resident's bitterly false accusation. This was a pretext. Dr. Olinger's allegation against Dr. Camillo is false—knowingly so—and, in fact, Dr. Olinger is believed to have made statements about accusing another physician of sexual harassment because, in apparent reference to Dr. Camillo, *it had worked before.*

30. Due to the discrimination and retaliation, Dr. Camillo has suffered irreparable damage to his career, damage to his reputation, and monetary losses in the eight figures. He has suffered emotional harm, distress, and humiliation due to the particularly vicious and false reasons given for his termination and the impact of the termination upon his career in medicine.

31. The actions taken by Campbell Clinic, P.C. were intentional and arose from Dr. Camillo's disability, his disability-related accommodation of leave and flexible work, and its fears about his cancer and accommodation recurring in the future. Defendant Olinger attempted to further her own career at Dr. Camillo's expense.

32. Subsequent to the termination of Dr. Camillo's employment, as referenced above, upon information and belief, Defendant Olinger attempted to falsely accuse another physician of sexual harassment in bad faith.

---

[1]   R-Chop certainly did *not* cause Dr. Camillo to use a slur word toward the resident. That did not occur.

33. Upon information and belief, Defendant Olinger was overheard by a charge nurse and another resident physician at University of Tennessee Health Sciences Center (UTHSC) stating that she would falsely accuse another male resident physician of sexual harassment since it had already worked before, presumably referring to Plaintiff.

34. Upon information and belief, the nurse and resident who overhead Dr. Olinger make this statement filed a complaint with UTHSC. UTHSC conducted an investigation finding Defendant Olinger at fault.

35. Plaintiff has suffered irreparable damage to his character and reputation as well as monetary damages due to Defendants' actions.

36. Further, Plaintiff has suffered emotional distress from the stress caused by Defendants' actions.

37. Plaintiff has suffered and will continue to suffer lost wages, profits, benefits and other compensation.

38. Plaintiff's damages were a direct and proximate cause of Defendants' actions.

39. Following his removal as a shareholder and an employee, Plaintiff was informed that Defendant Campbell Clinic PC was paying for Defendant Olinger's legal fees relating to her accusation against him even though she is not an employee or member of Defendant Campbell Clinic PC.

40. Upon information and belief, Plaintiff believes that Defendants engaged in a civil conspiracy to wrongly have Plaintiff removed from employment at Defendant Campbell Clinic, PC due to Defendant Olinger's false and defamatory accusation in order that Defendant Campbell

Clinic PC could avoid any further effects of Plaintiff's cancer—whether leave, accommodation, disability payments, or other benefits.

41. Defendants' actions above were malicious, intentional, fraudulent, reckless, and in bad faith.

42. Defendant Dr. Olinger's actions of intentionally and maliciously making false statements in bad faith as to Dr. Camillo was not in the ordinary and natural course of her or her employer's business.

43. Furthermore, Defendant Olinger, by acting maliciously, intentionally, fraudulently, recklessly, and in bad faith, was acting outside the scope of her employment.

## III.   CAUSES OF ACTION

### Count One – ADA-AA

44. Plaintiff, Dr. Camillo, incorporates by reference all allegations in all other sections.

45. Dr. Camillo brings the following causes of action against Campbell Clinic, P.C.:

   A. **ADA-AA**. Discrimination because of an actual disability (cancer); past record of disability (cancer); or "regarded as" disability (fear of cancer and the accommodation-need recurring in the future).

   B. **ADA-AA.** Denial of a reasonable accommodation of anger management (in lieu of termination).

   C. **ADA-AA.** Retaliation (termination) for taking an ADA Accommodation of flexible leave.

46. Dr. Camillo seeks his lost earnings and lost earning capacity; back pay and front pay; compensatory emotional distress, and pain and suffering damages; punitive damages for the

intentional deprivation of his rights under the ADA-AA; along with reasonable attorneys' fees and costs.

### Count Two – Defamation

47.     Plaintiff adopts and incorporates herein all allegations in all other sections.

48.     Libel is written defamation and slander is spoken defamation.  Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc., 876 S.W.2d 818, 820 (Tenn.1994).  "The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation."  Davis v. The Tennessean, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001); Quality Auto Parts, 876 S.W.2d at 820.

49.     The Tennessee Supreme Court has described the elements necessary to establish a prima facie case of defamation as follows: "the plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." Sullivan v. Baptist Memorial Hospital, 995 S.W.2d 569, 571 (Tenn.1999).

50.     Defendant Olinger published a statement on April 30, 2018, in an email to Dr. Throckmorton of Campbell Clinic, PC, which was forwarded to the President of Campbell Clinic, PC, knowing it was false, defaming Plaintiff with reckless disregard for the truth of the statement.

51.     Defendant Olinger also resubmitted the same allegation to Defendant, Campbell Clinic in a later email.

52.     Because of Defendant Olinger's defamatory statement, Plaintiff's character and reputation have been damaged irrevocably.

53.     Plaintiff has suffered damages due to Plaintiff's suspension and termination from his employment with Defendant Campbell Clinic, PC.

### Count Three – Intentional Infliction of Emotional Distress

54.     Plaintiff adopts and incorporates herein all allegations in all other sections.

55.     The elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff.  *See* Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn.2004); Leach v. Taylor, 124 S.W.3d 87, 92 (Tenn.2004).

56.     Defendant Olinger intentionally or recklessly asserted false accusations that Plaintiff referenced her with a slur and reported that false accusation to Plaintiff's employer.

57.     Defendant Olinger's conduct of falsely accusing Plaintiff of this conduct is not tolerated by a civilized society.

58.     Defendant Olinger's conduct is made even more repugnant by the evidence received by Plaintiff that she attempted to engage in this outrageous conduct again against another male doctor.

59.     As a result of Defendant Olinger's actions, Plaintiff, in remission for cancer, has sought medical treatment for the increased level of stress Defendant Olinger's false accusation has caused and is concerned about the stress's effect on his recovery.

60.     Further, Plaintiff has suffered severe mental injury due to the persecution he is subjected to due to the outrageous conduct of Defendant Olinger.

61.     Plaintiff hereby demands that the Court award Plaintiff compensatory damages and punitive damages in an amount to be determined by a jury.

### Count Four – Negligent Infliction of Emotional Distress

62. Plaintiff adopts and incorporates herein all allegations in all other sections.

63. In order to make a showing negligent infliction of emotional distress, Plaintiff must present material evidence as to each of the five elements of general negligence—duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause. Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993).

64. Defendant Olinger, as a member of a civilized society, had a duty not to make false, defamatory statements about Plaintiff.

65. Defendant Olinger breached that duty by emailing Plaintiff's employer that he had made reference to her with a highly inflammatory slur when in fact he had not.

66. Plaintiff has suffered both mental injury and monetary injury as a result of Defendant Olinger's conduct.

67. Defendant Olinger's false allegation is the direct and proximate cause of Plaintiff's damages, and but for Defendant Olinger's false allegation Plaintiff would not have been suspended from his position, voted out of his practice after fourteen years, and suffered the mental and physical anguish from which he now suffers.

68. As a result of Defendant Olinger's negligent infliction of emotional distress on Plaintiff, Plaintiff is entitled to an amount of compensatory and punitive damages to be determined by a jury.

### Count Five – Tortious Interference with Contract

69. Plaintiff adopts and incorporates herein all allegations in all other sections.

70. In order to recover for tortious interference with contract, Plaintiff must show there was a legal contract for a designated term, Defendant had knowledge of the contract, Defendant maliciously intended to induce a breach of the contract, there was a breach proximately caused by Defendant's acts, and Plaintiff was damaged as the result of the breach.

71. Plaintiff was a contractual employee and shareholder with Campbell Clinic, PC.

72. Defendant Olinger knew that Plaintiff was a shareholder physician with Campbell Clinic, PC as she expressed a desire to join the practice upon completion of her residency.

73. Defendant Olinger maliciously intended to cause a breach of the contract by alleging that Plaintiff had made reference to her with a highly inflammatory slur when in fact he had not.

74. As the direct and proximate cause of Defendant Olinger's false allegations against Plaintiff, Campbell Clinic, PC suspended Plaintiff and voted him out of the practice shortly thereafter.

75. Plaintiff has been damaged and will continue to be damaged by Defendant Olinger's actions.

### Count Six – Tortious Interference with Business Relations

76. Plaintiff adopts and incorporates herein all allegations in all other sections.

77. This action is brought against Defendant Olinger for tortious interference with Plaintiff's business relations in violation of Tennessee common law.

78. In order to show tortious interference with business relationships, Plaintiff must show (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) Defendant's knowledge of that relationship and not a mere awareness of Plaintiff's business dealings with others in general; (3) Defendant's intent to

cause the breach or termination of the business relationship; (4) Defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

79. Defendant Olinger had knowledge of Plaintiff's business and prospective business relationships as a physician shareholder with Campbell Clinic, PC.

80. Defendant Olinger, as a resident engaging in a rotation staffed by Campbell Clinic, PC, had knowledge that Plaintiff was a physician member of Campbell Clinic, PC and is in a contractual relationship with Campbell Clinic, PC.

81. Upon information and belief, Defendant Olinger has knowingly and intentionally interfered with Plaintiff's contractual relationship with Campbell Clinic, PC in order to take Plaintiff's place at Defendant Campbell Clinic, PC as an employee and potentially as a shareholder.

82. Defendant contacted Plaintiff's employer, Campbell Clinic, PC and made a patently false and slanderous accusation concerning Plaintiff in an effort to cause a breach or termination of that business relationship.

83. Defendant's improper means, and also her improper motive, is demonstrated by her use of a false allegation communicated to Plaintiff's employer.

84. Defendant's improper means, and also her improper motive, is further demonstrated by the evidence received by Plaintiff that she attempted to use this same outrageous conduct to damage another male physician at UTHSC for which Defendant was found at fault.

85. As a direct and proximate result of Defendant's tortious interference with Plaintiff's relationships as described above, Plaintiff has incurred damages in an amount not yet fully ascertained, but Plaintiff has been suspended from his employment and was voted out of his practice due to Defendant's false statement.

## Count Seven – Civil Conspiracy

86. Plaintiff adopts and incorporates herein all allegations in all other sections.

87. "Civil conspiracy is not independently actionable, but rather requires an underlying tort to establish vicarious liability for the underlying tortious conduct." Watson's Carpet & Floor Coverings, Inc. v. McCormick, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007).

88. Defendant Olinger and Defendant Campbell Clinic, PC have engaged in a civil conspiracy to illegally terminate the employment of Plaintiff and have him removed as a shareholder by cooperating in committing the aforementioned torts of defamation (Count One), intentional infliction of emotional distress (Count Two) and negligent infliction of emotional distress (Count Three).

89. Defendant Campbell Clinic, PC assisted Defendant Olinger in defaming Plaintiff by re-publishing a statement that it knew or should have known was false.

90. Defendant Campbell Clinic, PC assisted Defendant Olinger in intentionally inflicting emotional distress on Plaintiff by re-publishing and relying on the defamatory statement made by Defendant Olinger to terminate Plaintiff's employment and shareholder status without any corroboration of that statement or regard for the truth or falsity of that statement.

91. Defendant Campbell Clinic, PC assisted Defendant Olinger in negligently inflicting emotion distress on Plaintiff by re-publishing and relying on the defamatory statement made by Defendant Olinger to terminate Plaintiff's employment and shareholder status without any corroboration of that statement or regard for the truth or falsity of that statement.

92. Upon information and belief, Defendant Olinger and Defendant Campbell Clinic PC were both improperly motivated to have Plaintiff removed from employment and membership in Campbell Clinic, PC, each with a purpose to harm Dr. Camillo.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Dr. Camillo, respectfully prays for the following relief:

1. That proper process issue with regard to Defendants;
2. That the Court award him loss of past and future earning capacity, back pay and front pay;
3. That the Court award him compensatory damages;
4. That the Court award him punitive damages;
5. That the Court award him reasonable attorneys' fees and costs;
6. That this matter be tried before a jury; and
7. That the Court issue any and all other relief that is just and reasonable.

Respectfully submitted,

**GILBERT McWHERTER SCOTT & BOBBITT, PLC**

s/Justin S. Gilbert
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423-499-3044
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com
*www.gilbertfirm.com*